**UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MASSACHUSETTS
WESTERN DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| | Case No. 15-30404-HJB |
| SPECTRUM ANALYTICAL, INC. | |
| Debtor. | |

| | |
|---|---|
| In re: | Chapter 11 |
| | Case No. 15-30405-HJB |
| HANIBAL TECHNOLOGY, LLC | |
| Debtor. | |

**MEMORANDUM IN SUPPORT OF EMERGENCY MOTION OF RECEIVER, W. MARK RUSSO FOR RELIEF PURSUANT TO §543(d)(1) AND FOR REQUEST FOR EMERGENCY HEARNG AND EMERGENCY DETERMINATION**

W. Mark Russo, Esq. ("Receiver"), in and only in his capacity as the duly appointed Receiver for Spectrum Analytical, Inc. ("Spectrum") and Hanibal Technology LLC ("Hanibal Technology") (collectively the "Receivership Entities") hereby submits the instant Memorandum in Support of the Receiver's Motion respectfully requesting that this Court grant the Receiver relief pursuant to Bankruptcy Code §543(d)(1) and the request for an Emergency Hearing and an Emergency Determination as further explained herein.

In support thereof, the undersigned Receiver respectfully represents to the Court as follows:

**Introduction**

This Motion is brought pursuant to Bankruptcy Code §543(d)(1) and Local Bankruptcy Rule 9013-1(g) and seeks an Order of this Court on an expedited basis allowing the Receiver to

retain all property and assets of the Receivership Entities, including the ongoing business operations of Spectrum, rather than requiring the Receiver to turn over all assets and property to the debtors in the instant Chapter 11 matter (the "Debtors").  As set forth below in further detail, the Receiver, as a custodian in possession of property of the Debtors, should be excused from relinquishing said assets to the Debtors, as it will be made overwhelmingly clear below that any relinquishment of the Receivership Entities' assets would not be in the best interest of the Debtors' creditors.

Further, the Receiver's request for an expedited determination is justified based upon the fact that relinquishment of the property and ongoing business operations of the Receivership Entities by the Receiver will in all likelihood prevent the ongoing business operations of the Receivership Entities from continuing and the return of the businesses to the Debtor will only further perpetuate the highly questionable, if not, fraudulent actions of Debtor while deepening the insolvency of the Receivership Entities.[1]

**Background**

### A.    **The Receivership Proceedings**

1.    In or around January, 2014, BankRI, a financial institution chartered under the laws of the State of Rhode Island with its principal place of business in Providence, Rhode Island issued several loans to the Receivership Entities (the "Loans"), with repayment of the Loans guaranteed by Hanibal Tayeh and secured by several properties including the property located at 11 Almgren Drive and 830 Silver Spring Street, Agawam, Massachusetts (hereinafter the "Massachusetts Properties").

2.    Thereafter, the Receivership Entities defaulted on the Loans.

---

[1] An evidentiary hearing with regard to these matters should be scheduled.  In the meantime, the status quo should be preserved and the Receiver should be excused from turnover until this Court has an opportunity to conduct an evidentiary hearing on the issues identified herein.

2

3. In turn, on or about April 1, 2015, BankRI filed a Petition for the Appointment of a Receiver for Spectrum and Hanibal Technology in the case captioned *Bank Rhode Island v. Spectrum Analytical, Inc. and Hanibal Technology, LLC,* Superior Court for the County of Washington, Docket WC 15-0155 (hereinafter the "Rhode Island Receivership Proceeding").[2]

4. BankRI appeared as a secured creditor of the Receivership Entities, with respect to the Loans advanced by BankRI to the Receivership Entities.

5. The Receivership Proceedings were brought in the Rhode Island Superior Court as the Receivership Entities and Hanibal Tayeh consented to the jurisdiction of the courts of the State of Rhode Island pursuant to the loan documents with BankRI.

6. The Receiver was then appointed in the Rhode Island Receivership Proceeding and assumed responsibility for day-to-day operations of Spectrum and Hanibal Technology. A true and accurate copy of the Temporary Receivership Order is attached hereto and incorporated herein as **Exhibit A**.

7. The Receivership Proceedings were precipitated by the fact that BankRI had concerns with regard to a $30,000,000.00 letter of credit (the "Samba Letter") purportedly issued by Samba Financial Group of Saudi Arabia to Hanibal Technology while BankRI and the Receivership Entities were negotiating their financial relationship. BankRI's suspicions were apparently correct as since the Receiver's appointment, the Samba Letter has been admitted to be a fraudulent document.

---

[2] The Rhode Island Receivership Proceeding was assigned to the Out-County-Business Calendar and is being supervised by Justice Brian P. Stern.

B. **Actions by Receiver To Date**

### Overview of Pre-Petition Operations

8. Prior to the Receiver's appointment, Spectrum provided full service environmental testing laboratories with services that included the performance of organic, inorganic, wet chemistry and microbiological testing, as well as air analysis.

9. Spectrum has several locations including: Agawam, Massachusetts; North Kingstown, Rhode Island; Syracuse, New York; New Jersey; and Tampa, Florida. Therewith, Spectrum employees over 150 professionals. Spectrum's client base includes services to private firms, municipalities and the government sector.

### Marshalling the Corporate Assets

10. Immediately subsequent to the Receiver's appointment, the Receiver took steps to marshal and preserve the assets and property of the Receivership Estate. These efforts included notifying the financial institutions believed to maintain pre-petition accounts of the Receivership entities, as to the pendency of these proceedings and coordinating for the turnover of those funds.

11. Further, the Receiver took steps to secure the office and building space at Spectrum's headquarters in Agawam, Massachusetts. Moreover, the Receiver coordinated to have a copy of Spectrum's electronic records preserved the same day that the Receive was appointed. The Receiver has also restricted IT access to the minimal levels necessary to maintain ongoing operations. Further, the Receiver restricted access to the executive office at the Agawam facility. During this process, the Receiver was advised that pre-Petition, IT staff were directed to delete incoming and outgoing e-mails to Dr. Hanibal Tayeh ("Dr. Tayeh").

12. In addition, the Receiver was advised that Dr. Tayeh removed his workplace computer from his office prior to the Receiver's appointment. The Receiver has requested

4

access to these items from Dr. Tayeh's counsel, as this information is property of the Receivership Entities. These requests went unanswered. In turn, the Receiver filed a Motion to Compel access to these items with the Receivership Court.

### **Status of Business Operations**

13. At the time of the Receiver's appointment, the Receiver immediately took steps to assess the status of business operations. In turn, the Receiver learned that business operations could not sustain in their status quo condition for a number of reasons. Foremost, Spectrum was insolvent.

14. The Receiver made the determination that Spectrum was insolvent based upon several factors, including but not limited to the following:

    i. Spectrum's primary operating account at BankRI was overdrawn by approximately $542,000.00 at the time of the Receiver's appointment;

    ii. BankRI advanced approximately $120,000.00 immediately prior to the Receiver's appointment, as Spectrum could not meet its payroll obligations;

    iii. Spectrum owed its vendors approximately $1.3 M at the time of the Receiver's appointment;

    iv. Many of Spectrum's critical vendors had placed Spectrum on credit holds, including air gas suppliers and environmental waste disposal providers;

    v. Spectrum owed BankRI approximately $9 M relative to its lending relationship;[3]

    vi. Spectrum had exhausted its ability to borrow under its lending relationship with BankRI;

---

[3] The above amount is based on the information available to the Receiver at this point. BankRI has not submitted a formal proof of claim in the Receivership Proceeding.

  vii. Spectrum was encumbered by loans allegedly taken by Hanibal exceeding $400,000.00;

  viii. Spectrum had paid over $1M in loans to Dr. Tayeh without generating any revenues and despite operating at a loss; and

  ix. Spectrum had advanced payments in excess of $230,000.00 to Hanibal in 2014, alone without generating any return profit for said expenditures.

15. Compounding the financial issues outlined above, Spectrum had already invested significant sums, potentially in the range of millions of dollars, in foreign investments for business agreements allegedly being pursued by Hanibal for Spectrum, which whether or not valid business agreements, never rendered any profits to Spectrum.

16. From the Receiver's diligence, Dr. Tayeh's primary business function was as a representative/agent for Spectrum with regard to said international agreements.  The Receiver's initial due diligence has not shown that Hanibal and/or Dr. Tayeh's services generated any profits to Spectrum. The Receiver has been advised of an agreement allegedly worth some $4M. However, the Receiver has not been able to confirm the existence of any such agreement nor has there been any revenue received by Spectrum from any such agreement.

17. Further, on the eve of the Receivership, while Spectrum was in dire-straights, Dr. Tayeh caused Spectrum to borrow approximately $95,000.00 from a private firm called, ECS.  Notwithstanding, Dr. Tayeh immediately directed the substantial portion of this loan to his brother, Emile Tayeh and the balance of said loan to Hanibal Technology. The documents regarding this issue are attached hereto and incorporated herein as ***Exhibit B***.

18. Moreover, the Receiver became aware of certain unorthodox business practices by the prior management of Spectrum including the fact that Spectrum's principal, Dr. Tayeh

6

had induced several vendors to provide goods and services at a point in time when Spectrum was insolvent by asking vendors to stay on board and to continue to do business with Spectrum providing a purported letter of credit from TD Bank, which is attached hereto as *Exhibit C*.

19. The initial indication from TD Bank is that said letter of credit is not authentic. In turn, TD Bank has referred the matter to its fraud unit. Regardless of the authenticity of this document, it was utilized to induce vendors to do business with Spectrum at a time when Dr. Tayeh knew (or should have known) that Spectrum did not have the ability to pay its debts, which only deepened the insolvency of Spectrum.

20. Further, when the Receivership was initiated there was a concern expressed by BankRI with regard to certain documents which on their face, did not appear to be authentic documents. In turn, Receiver took initial steps to review said documents to determine whether there was any legitimacy to those concerns.

21. Concerning to the Receiver is that in doing so there have been several documents, which the Receiver has been unable to authenticate, including but not limited to:

    i. The TD Bank commitment letter attached hereto as *Exhibit C*;

    ii. Certain IRS documents, which the IRS has been unable to authenticate at this point attached hereto as *Exhibit D*;

    iii. The Samba Bank letter of credit, which has been admitted to be a fraudulent document – *Exhibit E*;

    iv. BankRI commitment letter from March 2015, which BankRI has advised is not a letter issued by BankRI – *Exhibit F*; and

    v. BankRI decision letter from January 2015, which BankRI has advised is not a letter issued by BankRI – *Exhibit G*.

22. In addition, the Receiver in conducting due diligence of the business and preserving records has reviewed many documents which are extremely unusual in the ordinary course of business, including blank check templates, as well as deposit statements, signature blocks and logos which appear to have been copied from other sources.  Further, the Receiver has reviewed two (2) e-mails from Dr. Tayeh which instructed Spectrum staff to adjust financial records of the company to better reflect its financial position. These e-mails are attached hereto as ***Exhibits H and I***.

23. Further compounding Spectrum's operating issues is the fact that management and staff had lost all confidence in Dr. Tayeh's ability to lead and run Spectrum's business operations. This was unequivocally conveyed to the Receiver from the outset of the Receivership.  Thus, the overall status of Spectrum's business operations could not be sustained without some restructuring and operational changes.

24. With the above background, the Receiver was forced to use his business judgment in determining that it was not in the best interest of business operations to continue to employ Dr.  Tayeh or his family members.

25. Further, while the Receiver does not and will not offer any conclusions with regard to the unorthodox business records reviewed, the questionability of these records is serious enough that the Receiver has reported these matters to the Financial Crimes Unit of the Rhode Island State Police, the U.S. District Attorney's Office, the IRS and the Massachusetts Attorney General's Office, in order that these authorities may take any steps that they deem appropriate with respect to investigating these matters.

26. From the Receivership standpoint, what has become abundantly clear is that: (1) At the time the Receiver was appointed, Spectrum could not maintain its ongoing operations

absent a Receivership, due to its financial position as well as its internal and external instabilities caused by its unorthodox business practices; and (2) Court-supervision to protect the assets of Spectrum is necessary in light of the unusual business practices and other issues which have been identified to the Court.

### Stabilizing Business Operations

27.     The Receiver immediately took steps to attempt to try to stabilize business operations and preserve the value of the ongoing Receivership entity.  First, the Receiver dedicated a significant amount of time to meeting with employees from the Agawam, Syracuse, Tampa and Rhode Island facilities to explain the Receivership process.  Further, the Receivership has coordinated with employees to put in place operating procedures for post-Petition operations.

28.     Moreover, the Receivership appointed a Chief Operations Officer at the Agawam facility to report to the Receivership and to foster on-site leadership on a day-to-day basis during the Receivership period.  In addition, the Receivership has engaged a consultant, Mr. Seth Schalow to assist with day-to-day operating matters as well as to assist with turnaround efforts.

29.     Simultaneously, the Receiver has dedicated a significant amount of time to communicating with critical vendors and clients, in order to convince vendors that there is a benefit to working with the Receivership process on a post-Petition basis and reinstating business terms for post-Petition operations.  The Receivership has been fortunate in that many vendors have been willing to work with the Receivership process.  However, the Receivership has been faced with the difficult challenge of addressing legitimate vendor questions in that many vendors have indicated that they were promised payments by Dr. Tayeh immediately prior to the

Receiver's appointment and have now learned that Spectrum was not in a position to fulfill those promises when made.

30. Notwithstanding these challenges, the Receivership has been able to accurately forecast cash flow and has operated for 20 days without the need for any outside cash infusion. Absent those steps, cash collateral would need to be infused to maintain operations, which BankRI has indicated that it is unwilling to do if the Debtor assumes control of operations.

31. Thus, in less than one month of operations, the Receivership has been able to successfully accomplish the following:

   a. Sales Total: $1,050,000.00;

   b. Cash Receipts, Receivable Collections: $1,169,301.10;

   c. Operating Expenses Paid by Receiver: ($642,085.09);

   d. Operating Cash: $527,216.01;

   e. Operating Expense Liability Carried: ($99,766.94);

   f. Net Income: $427,449.07;[4]

   g. Receivables under 90 days: $1,787,996.37; and

   h. Receivables 91 days to 150: $199,650.42.

32. In addition, the Receivership wants to make it clear that the Receivership has developed a level of credibility internally and externally and if operations at this point were allowed to proceed with the Debtor assuming control, the business would in all likelihood fail.

**Marketing Procedures**

33. With the stabilization of business operations under way, the Receiver has also developed a marketing package to provide to the universe of potential purchasers for Spectrum to

---

[4] The operating cash indicated above is provided prior to payroll expenses.

10

indicate the value of the ongoing operation, with normalized operating procedures and financial plans in place.

34. The Receiver has engaged accounting professionals who have compiled historical financial data into a format that will assist the marketplace in assessing the value of the operating entity, which the Receiver is in the process of compiling into a Comprehensive Bid Package along with a description of the tangible assets of the Receivership entities.

35. Further, the Receiver has engaged a non-exclusive broker to assist with marketing efforts. The Receiver suggests that this step is crucial in the successful disposition of this matter as a broker will be able to expose the normalized financial status of the operating entities to its targeted universe of potential purchasers and further assist the Receiver in explaining the value of the ongoing business to this specialized marketplace.[5]

36. Moreover, the Receiver has communicated with two well-recognized laboratories who have expressed an initial interest in the operations of Spectrum. The Receiver, if allowed to maintain operations, would intend to continue his efforts to communicate with prospective purchasers of the business assets of Spectrum and would report to the Court as this process proceeds.

37. Thus, the turnover of the Receivership Entities assets with marketing efforts well underway would only create confusion and instability which would unquestionably jeopardize the value of the assets.

C. **Unorthodox Pre-Petition Business Issues**

38. As a part of the Receivership process, the Receiver has reviewed the books and records of both Spectrum and Hanibal Technology.

---

[5] Dr. Tayeh very recently consented to the engagement of the non-exclusive broker to proceed with the marketing of the Receivership Entities assets.

11

39. As a result of said review of the books and records of the Receivership Entities, the Receiver determined that Hanibal Tayeh, to the detriment of Spectrum and its creditors, may have undertaken the following:

   a. Paid personal loans with the use of corporate funds of the Receivership Entities;

   b. Upon information and belief, created documents purportedly from the IRS, which to date, the IRS has not been able to authenticate;

   c. Sent e-mails to staff members of the Receivership Entities instructing them to manipulate financial reports to increase and overstate Spectrum's financial position. *See **Exhibits H and I**;*

   d. Booked accounts receivable, and invoiced and paid commissions on sales from a purported contract with a company based out of Saudi Arabia. However, there does not appear to be any revenues generated from said contract;

   e. Took substantial, personal loans which are outstanding from the Receivership Entities;

   f. Admitted that the $30M Samba Letter provided to the Receivership Entities is fraudulent although Dr. Tayeh has maintained that he did not create this document;

   g. Provided a commitment letter from TD Bank to vendors to incentivize their continued business which TD Bank has initially indicated is not an

authentic document from TD Bank. In turn, TD Bank has referred the letter to its fraud unit;[6]

h. Negotiated receipt of a loan of $95,000 purportedly to be used to help fund the business operations of Spectrum, which was instead wired out by Dr. Tayeh as follows:

1. $69,863.02 to Dr. Tayeh's brother, Emile Tayeh; and

2. $24,000.00 to a bank account with Bank of America held in the name of Hanibal Technology and over which Dr. Tayeh had signatory authority; and

k. Upon securing the records of the Receivership Entities, the Receiver discovered that Dr. Tayeh had instructed IT personnel to delete incoming and outgoing e-mails from the following accounts controlled by Dr. Tayeh: HT_Confidential@spectrum-analytical.com, Amanda.tayeh@hotmail.com, etayeh@hotmail.com and karaminternationallaw@gmail.com. In addition, Dr. Tayeh removed his workplace desktop computer, shortly before the Receiver's appointment.

40. As a result of the above matter, the Receiver filed an action with the Massachusetts Superior Court, sitting in Suffolk County, Business Litigation Session, case captioned *W. Mark Russo, Esq., in his capacity as Temporary Receiver of Spectrum Analytical, Inc. and Hanibal Technology LLC vs. Hanibal Tayeh, Emile Tayeh, and Westfield Bank*,

---

[6] The e-mails attached at ***Exhibit H and I*** are two instances where Dr. Tayeh drafted e-mails to induce vendors to continue to conduct business with Spectrum. The Court should pay particular attention to the signature line of the TD Bank Letters. The signature on the TD Bank letter sent to these vendors appears to match the signature of a Bank RI letter purportedly from Mr. Timothy Coggins. If that is the case, this is an issue of actual fraud, which is not for the Receiver to determine, but is one reason why the Receiver has reported these matters to the appropriate authorities.

Superior Court for the County of Suffolk, Civil Action No. SUCV2015-01050-BLS2 (the "Massachusetts Action").

41. Contemporaneously, the Receivership up and until learning of the instant proceeds was also in the process of filing an ancillary Receivership Petition with the Suffolk County Court, in order that the Rhode Island Receivership Proceedings could move in parallel with a Massachusetts proceeding, a process which this Receiver has successfully carried out in other insolvency proceedings.

42. On or about April 30, 2015, Hanibal Tayeh filed Chapter 11 petitions on behalf of Spectrum Analytical, Inc. and Hanibal Technology, LLC.

## Argument

### A. The Turnover of Assets by the Receiver should be Excused Pursuant to Bankruptcy Code Section 543(d)

The Receiver should not be required to turn over the property and assets of the Receivership Entities, including the Receivership Entities ongoing operations, because such a turnover is excusable under Bankruptcy Code §543(d)(1). The analysis applied in determining whether to excuse a turnover is decided by the interests of a debtor's creditors, and, specifically "whether the interests of creditors would be better served" by excusing such a turnover. *Dill v. Dime Sav. Bank, FSB (In re Dill)*, 163 B.R. 221, 225 (E.D.N.Y. 1994). In turn, bankruptcy courts have identified the following five factors to guide the determination of whether to excuse a turnover:

(1) Whether there will be sufficient income to fund a successful reorganization;

(2) Whether the debtor will use the turnover property for the benefit of creditors;

(3) Whether there has been mismanagement by the debtor;

14

Case 15-30404    Doc 19    Filed 05/01/15    Entered 05/01/15 12:08:00    Desc Main
Document      Page 15 of 18

(4) Whether or not there are avoidance issues raised with respect to property retained by a receiver, because a receiver does not possess avoiding powers for the benefit of the estate; and

(5) The fact that the bankruptcy automatic stay has deactivated the state court receivership action.

*Id.*

In the instant matter, the operative facts overwhelmingly demonstrate that the Receiver should be excused from turning over the assets and property of the Receivership Entities. It is abundantly clear that a turnover would not be in the best interest of the Debtors' creditors, and would likely irreparably harm their interests.

With regard to the first factor, it is unrealistic to say there is any legitimate likelihood that the Debtors can successfully reorganize the instant Estate. BankRI holds the largest secured claim in the Debtor's bankruptcy estate and has indicated that it will not consent to a plan of reorganization. In addition, the mismanagement of the Debtor has suffocated its financial position well beyond any possibility of restructuring, as evidence by the status of the pre-petition operations outlined above. Further, considering the actions of Dr. Tayeh in regard to Spectrum and Hanibal Technology, it is unlikely that a sufficient amount of Debtor's creditors would be convinced that a plan of reorganization would be in their best interests.

Moreover, in considering the second factor, given the prior actions of Dr. Tayeh engaging in numerous highly questionable, if not, fraudulent actions to the detriment of the Receivership Entities, there is no reasonable belief that the Dr. Tayeh would utilize use possession of the assets for the benefit of creditors. Dr. Tayeh's initial response to the Receivership Proceedings clearly demonstrates that Dr. Tayeh's priority is not in pursuing the best interest of creditors of

15

the Estates. *See* **Exhibit J**. Further, Dr. Tayeh's actions are questionable enough there is no reasonable basis to believe that Dr. Tayeh would not put the property and assets of the Debtors at risk. Pre-petition, Dr. Tayeh engaged in numerous unorthodox and potentially fraudulent actions in regard to the finances of Spectrum and Hanibal Technology, including personal use of corporate funds, instructing employees to manipulated financial records and providing letters of credit that have been confirmed as not being authentic both to BankRI and the questionable TD Bank letter given to certain vendors. Further, on the very eve of the Receivership, Dr. Tayeh caused Spectrum to borrow $95,000.00 and to offset this amount against Spectrum receivables. Notwithstanding, Dr. Tayeh immediately diverted these funds to his brother, undoubtedly not an action that is in the best interest of all creditors.

Due to this troubling history of events, it is apparent that the condition of the instant Estates would only decline if the Debtors, under the leadership of Hanibal Tayeh, were permitted to repossess the assets and ongoing business operations.

Regarding the third factor – mismanagement, it is hard to contemplate a much stronger set of facts that evidence mismanagement of the estate. Setting aside whether Dr. Tayeh's actions rise to the level of fraudulent, Dr. Tayeh unquestionably mismanaged corporate funds, utilizing said funds for personal interests, induced vendors to continue to do business with Spectrum by use of a letter which does not appear to be authentic, instructed staff to manipulate financial records to overstate Spectrum's financial position and caused Spectrum to become more indebted at a time when Dr. Tayeh knew the business was insolvent. Moreover, as to the fourth factor, there are no avoidance issues that the Receiver is aware of at this point.

Finally, in regard to the fifth factor, the Receivership proceedings have not deactivated. The Receiver has notified the Receivership Court of the Chapter 11 filing and would request that

16

any relief requested from the Receivership Court would also be subject to the approval from this Court.

### B. The Request for Emergency Determination is Justified Pursuant to Local Bankruptcy Rule 9013-1(g)

Pursuant to Local Bankruptcy Rule 9013-1(g), the request for Emergency Hearing and Emergency Determination should be granted. As outlined above, there is a significant and immediate risk to the assets and the ongoing business operations of the Receivership Entities, until and unless the Receiver is authorized to continue to secure said assets. The actions of Dr. Tayeh pre-petition have substantially harmed the creditors of the instant Estate, which will likely increase if Dr. Tayeh is authorized to possess the assets and ongoing business operations of the Receivership Entities. Moreover, turning over the assets to the Debtors, with Dr. Tayeh returning to his prior position of officer and director, would only serve to further perpetuate the highly questionable and potentially fraudulent actions of Dr. Tayeh in regard to Spectrum and Hanibal Technology. In turn, the undersigned parties respectfully request the Court afford the Motion emergency status for hearing and determination.

As required under Local Bankruptcy Rule 9013-1(g), counsel for the Receiver has advised the Debtors' counsel of the substance of the Motion and has made good faith efforts to resolve this matter without this Court's intervention, but has been unsuccessful in doing so.

### Conclusion

WHEREFORE, the undersigned respectfully requests that this Court hear this matter on an Emergency basis and grant the Receiver relief pursuant to §543(d)(1) to excuse turnover of assets of the Receivership Entities.

W. Mark Russo, Esq., as and only as Receiver for Spectrum Analytical, Inc. and Hanibal Technology LLC

By their attorneys,

*/s/ W. Mark Russo*
W. Mark Russo (BBO# 554047)
**FERRUCCI RUSSO, P.C.**
55 Pine Street – 4th Floor
Providence, RI 02903
Tel:  (401) 455-1000
Fax:  (401) 455-7778
Email: jdorsey@frlawri.com

Dated:  May 1, 2015

## CERTIFICATION OF SERVICE

I hereby certified that on this 1st day of May, 2015, I filed and serve this document through the CMECF electronic filing system on the following parties:

- Michael B. Katz     mkatz@baconwilson.com
- Richard King     USTPRegion01.WO.ECF@USDOJ.GOV
- Spencer A. Stone     sstone@baconwilson.com, Dwayne@baconwilson.com

*/s/ W. Mark Russo*

*k:\s\spectrum analytical\pleading\bankruptcy\memorandum in support of emergency motion to appoint debtor in possession.docx*