UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

| In re:<br><br>SPECTRUM ANALYTICAL, INC.<br>    Debtor | Case No. 15-30404 HJB<br>Chapter 11 |
|---|---|

| In re:<br><br>HANIBAL TECHNOLOGY, LLC<br>    Debtor | Case No. 15-30405 HJB<br>Chapter 11 |
|---|---|

**MOTION OF SECURED CREDITOR FOR ABSTENTION
AND REQUEST FOR EMERGENCY DETERMINATION**

Bank Rhode Island (the "Bank"), the major secured creditor of debtors Spectrum Analytical, Inc. ("Spectrum") and Hanibal Technology, LLC ("Hanibal", and together with Spectrum, the "Debtors"), asks the Court, on an EMERGENCY basis under MLBR 9013-1(g), to abstain from entertaining the Debtors' voluntary petitions for relief filed under Chapter 11 of the United States Bankruptcy Code (the "Petition") pursuant to 11 U.S.C. §305(a) because, on the facts of this case, the interests of creditors and the Debtors will be better served.  The Debtors' principal has been replaced by a temporary receiver for reasons that will become apparent below.  The Bank believes that the Debtors' principal has filed this petition in an effort to reinstate himself in control of the Debtors, an occurrence which would be to the substantial detriment of the Debtors and their creditors.  The facts and legal bases for the Motion follow.

**I.    FACTS**

1.    Spectrum, through its sole shareholder, Hanibal Tayeh ("Tayeh"), and Hanibal, through its sole member, Tayeh, filed voluntary petitions for relief under Chapter 11 of the United States Bankruptcy Code on April 30, 2015 (the "Petition Date").

2. On or April 1, 2015, the Bank filed a Petition for the Appointment of a Receiver for the Debtors in Washington County Superior Court in Rhode Island in accordance with the Debtors' consent to jurisdiction in that court. The Receivership is pending as W.C. No. 2015-0155. Judge Stern appointed W. Mark Russo as temporary receiver on April 2, 2015, and scheduled a hearing for the appointment of a Permanent Receiver for April 27, 2015.

3. At the request of Tayeh's counsel, the hearing on the appointment of a Permanent Receiver was continued from April 27th to May 11, 2015, upon the representation that Tayeh would obtain independent counsel to represent the Debtors at the hearing.

4. Instead, on April 30, 2015, Tayeh's Rhode Island counsel entered their appearance for both Debtors in the receivership proceeding despite their obvious lack of disinterestedness and apparent conflicts.

5. The Bank filed its receivership petition, in part, because Spectrum was in default of its loan facilities with the Bank including, without limitation, being overdrawn on its account at the Bank, and overadvanced on its receivables-based line of credit ("LOC") by over $3,000,000.00.

6. The Debtors' credit facilities[1] with the Bank include the loans identified and secured by the following loan documents:

    i. Credit Agreement dated January 15, 2014 among the Bank, Spectrum, and Hanibal, amended by instruments dated March 31, 2014, May 15, 2014, and June 27, 2014 (as amended the "Credit Agreement");

    ii. Revolving Credit Note by Spectrum and Hanibal dated January 15, 2014 in the principal amount of $4,400,000 payable to the Bank, amended by instruments dated March 31, 2014, May 15, 2014, and June 27, 2014 (as amended the "Revolving Credit Note");

---

[1] Hanibal is a co-borrower on all of the credit facilities. All loans are cross-defaulted and cross-collateralized. Hanibal's role appears to have been limited to acting as Spectrum's agent with respect to foreign activities.

2

        iii.        Term Note by Spectrum and Hanibal dated January 15, 2014 in the principal amount of $2,225,000 made payable to the Bank, amended by instruments dated March 31, 2014, May 15, 2014, and June 27, 2014 (as amended the "Term Note");

        iv.        Mortgage Note by Spectrum and Hanibal dated January 15, 2014 in the principal amount of $2,175,000 made payable to the Bank, amended by instruments dated March 31, 2014, May 15, 2014, and June 27, 2014 (as amended the "Mortgage Note");

        v.        Security Agreements dated January 15, 2014 between Spectrum and the Bank, and Hanibal and the Bank (collectively, the "Security Agreements");

        vi.        Open-End Mortgage, Security Agreement, and Collateral Assignment of Rentals and Lease by Spectrum in favor of the Bank with respect to property located at 646 Camp Avenue, North Kingstown, Rhode Island dated January 15, 2014 and recorded January 16, 2014 in Book 2805 at Pages 103-124 in the Town of North Kingstown, Rhode Island Land Evidence Records (the "North Kingstown Mortgage");

        vii.        Open-End Mortgage, Security Agreement, and Collateral Assignment of Rentals and Lease by Spectrum in favor of the Bank with respect to properties located at 11 Almgren Drive and 830 Silver Spring Street, Agawam, Massachusetts dated January 15, 2014 and electronically recorded January 16, 2014 in Book 20166, Page 236 (the "Agawam Mortgage"); and

        viii.        Guaranty Agreement of Hanibal C. Tayeh dated January 15, 2015 ("Guaranty").

7.      More importantly, however, the Bank uncovered evidence that Tayeh had, *inter alia*, (a) provided the Bank with a fraudulent letter of credit from Samba Bank as alleged security for a $17,100,000 foreign contract with Alzora Company Limited of Riyadh, Saudi Arabia dated December 19, 2012 (the "Alzora Contract") that Spectrum and Hanibal had offered as part of Spectrum's receivable base to borrow on the LOC; (b) pressured Spectrum's Chief Financial Offer to inflate Spectrum's receivables in order to improve Spectrum's perceived financial condition; and (c) presented to the Bank a copy of a $650,000 check drawn on Byblos Bank in Beirut, Lebanon payable to Tayeh and his wife, which Tayeh asserted would be used to pay down Spectrum's overdraft and overadvance, which Byblos Bank later confirmed was fraudulent.

3

8. Tayeh has acknowledged that the Samba Bank letter of credit is fraudulent.

9. In addition, the Bank's field examiners discovered inconsistencies and inadequate, atypical backup supporting Hanibal's invoices with respect to the alleged Alzora Contract, and concluded that no payments had ever been made on the Alzora Contract. Instead, the exam revealed that alleged intercompany payments from Hanibal to Spectrum that purportedly originated with Alzora (a) originated with Spectrum; (b) were transferred to Tayeh; (c) were then deposited into Hanibal; and (d) were then repaid to Spectrum purportedly with reference to the Alzora Contract.

10. The field examiners advised the Bank that, apart from the questionable actions of the Debtors' principal and uncertainties pertaining to the Alzora Contract, Spectrum had a sustainable business.

11. The field examiner then calculated the eligible borrowing base after eliminating the foreign account receivable allegdly owed to Hanibal under the Alzora Contract. This calculation demonstrated that Spectrum was out of formula by approximately $3,337,000.00.

12. Upon his appointment, the Receiver took aggressive and immediate action to advise Spectrum's employees that Tayeh was no longer in control of the Debtors, and took steps to comfort and settle Spectrum's employees, vendors, and creditors.

13. The Receiver was welcomed by Spectrum's employees, and received favorable responses to his communications with vendors and creditors.

14. The Receiver took immediate steps to preserve the Debtors' books and records, including obtaining mirror images of company hard drives.

15. In the course of securing the Debtors' books and records, the Receiver discovered more facts that confirmed the wisdom of the receivership.

16. As detailed in his first Temporary Receiver's Report filed April 24, 2015, the Receiver learned that, shortly before the receivership, Tayeh had directed an employee to delete certain emails from the Debtors' computer systems. The Receiver also learned that Tayeh had removed the company computer from his office, and replaced it with a different computer. A true copy of the Receiver's Report is attached hereto as **Exhibit A**.

17. The Receiver also uncovered records showing that on the very day the Bank filed its receivership petition, Tayeh caused Spectrum to borrow $95,000 via an advance on work that Spectrum was to perform over the next two months for one of Spectrum's most valued clients, Environmental Client Services, Inc. ("ECS"), and offered a 10% discount to ECS for those future services. The money was ostensibly borrowed for Spectrum's business purposes. Instead, Tayeh used those funds to pay $69,863.02 to his brother, Emil, to pay down Tayeh's personal loan from Emil. Tayeh used substantially all of the rest of the funds, $24,000, to pay a "different loan" to Hanibal. True copies of the documents relating to this transaction are attached as **Exhibit B**.

18. In addition, the Receiver advised the Bank that he discovered that, on April 2nd, the day the Receiver was appointed, Tayeh caused Spectrum to purchase two tickets to Lebanon from each of five different airports departing April 3rd.

19. On April 24, 2015, the Receiver filed his first Temporary Receiver's Report, detailing his activities and findings through the first three weeks of his oversight. This Report outlines just some of the improprieties that occurred while Tayeh was at the Debtors' helm. See particularly, Report, ¶¶12-21.

20. The following highly questionable documents have been discovered, either on the Debtors' computer systems or obtained from third parties to whom they were sent:

    a. The purported Samba Bank letter of credit, which the Debtors have admitted is a fraudulent document, a copy of which is attached hereto as **Exhibit C**;

5

   b. Two purported TD Bank commitment letters, copies of which are attached hereto as **Exhibit D**;

   c. Certain purported Internal Revenue Service ("IRS") letters as to which the Receiver has reported the IRS has been unable to authenticate, copies of which are attached hereto as **Exhibit E**;

   d. A purported $650,000 check drawn on Byblos Bank of Lebanon payable to Souad Metri Tayeh and Dr. Hanibal Tayeh, a copy of which is attached hereto as **Exhibit F**;

   e. A purported BankRI Board of Directors Decision letter dated January 28, 2015, a copy of which is attached hereto as **Exhibit G**; and

   f. A purported BankRI letter to the Massachusetts Attorney General's office dated March 18, 2015 allegedly confirming that BankRI will provide a $650,000 letter of credit on behalf of Spectrum, a copy of which is attached hereto as **Exhibit H**.[2]

21. Byblos Bank advised the Bank that the check, **Exhibit F**, was "a fraudulent draft". A true copy of the email exchange between the Bank and Byblos Bank is attached as **Exhibit I**.

22. The purported BankRI letters, **Exhibits G** and **H** are fraudulent.

23. In addition to stabilizing Spectrum's relationships with its employees, vendors, and creditors, the Receiver has taken substantial steps to identify possible purchasers. An agreed upon Order authorizing the engagement of a business broker, TechKNOWLEDGEy Strategic Group, an outfit with significant industry contacts, has been submitted to the court, and the broker has already registered at least ten parties interested in acquiring the assets of Spectrum.

---

[2] The Bank asks the Court to compare the signature on this letter to the signature on the purported TD Bank commitment letter dated February 23, 2015 at **Exhibit D**. The alleged signatory, Mr. Coggins, is the BankRI loan officer for the Debtors. He did not sign either letter. The Bank further directs the Court to the opening line of **Exhibit H**, where the letter states "Bank *of* Rhode Island RI". The Bank's true name is Bank Rhode Island, and it is commonly known as BankRI. (Italics added).

6

24. In addition, the Receiver has met or communicated with other individuals and groups who have expressed interest in acquiring Spectrum.

25. The Receiver negotiated consensual Interim Cash Collateral Order with the Bank to fund the Debtors' operations, and a second Interim Cash Collateral Order has been agreed to that provides funding through May 23, 2015.

26. The Receiver has engaged professionals to assist with management oversight, financial controls, and record preservation, and those professionals have been hard at work since the commencement of the receivership.

27. The Receiver and his team have made substantial progress to stabilize operations and restore the confidence of employees, vendors, and clients.

28. Business operations are running smoothly under the Receiver's supervision and, without the Debtors' principal in control, employee morale is improved, vendors continue to supply Spectrum, and its clients continue to utilize Spectrum's services.

29. By contrast, Spectrum's key management has team no confidence in Tayeh's leadership. See Report, ¶18.

30. Although the Debtors have not yet filed Schedules, Spectrum has stated in its Cash Collateral Motion [Doc 11, ¶11] that the secured debt to the Bank is approximately $8,900,000, and unsecured debt is approximately $1,367,213.14.

## II. APPLICABLE LAW AND ARGUMENT

**A. The Court should abstain from hearing the Petition because, in light of the conduct of the Debtors' principal and the travel of this case, the interests of creditors and the Debtors will be better served.**

Abstention is appropriate where that course of action is better for all parties. *11 U.S.C. § 305(a)*, entitled "Abstention," provides in relevant part that:

7

> The court, after notice and a hearing, may dismiss a case under this title, or may suspend all proceedings in a case under this title, at any time if --
>
> (1) the interests of creditors and the debtor would be best served by such dismissal or suspension….

In determining whether abstention under *§ 305(a)* is appropriate, courts examine the facts of each case in light of a number of criteria. The factors courts typically look at include:

1. economy and efficiency of administration;
2. whether another forum is available to protect the interests of both parties or there is already a pending proceeding in a state court;
3. whether federal proceedings are necessary to reach a just and equitable solution;
4. whether there is an alternative means of achieving the equitable distribution of assets;
5. whether the debtor and the creditors are able to work out a less expensive out-of-court arrangement which better serves all interests in the case;
6. whether a non-federal insolvency has proceeded so far in those proceedings that it would be costly and time consuming to start afresh with the federal bankruptcy process; and
7. the purpose for which bankruptcy jurisdiction has been sought.

*In re Fax Station*, *Inc.*, 118 B.R. 176 (Bankr. D.R.I. 1990). Viewing the applicable factors in light of the facts of this case, the Court should abstain from jurisdiction of this matter.

### 1. **Economy and Efficiency of Administration**

On the Petition Date, there was already in existence a receivership proceeding in which substantial steps had already been taken to stabilize the Debtors. The Receiver has met with Spectrum's employees multiple times, communicated with critical vendors and established payment terms with them, and communicated with customers assuring them of Spectrum's continued ability to service their needs. He has preserved books and records, negotiated consensual Cash Collateral Orders to sustain business operations, engaged financial and management professionals to assist with operations and transitioning Spectrum for sale, initiated sales activity to find a buyer for Spectrum, reviewed internal records to assess and

8

trace the flow of cash connected to questionable transactions, and met with law enforcement personnel to assist with the Debtors' fraud investigation.

If the Court does not abstain, many of these steps will have to be repeated, causing the Debtors to incur unnecessary additional administrative expenses and lost time. Continuation of the receivership proceeding and abstention with respect to the Petitions would enhance the economy and efficiency of administration. The Debtors' Petitions undermine the substantial judicial and other resources already invested in this case.

**2. Whether Another Forum is Available to Protect the Interests of Both Parties or there is already a Pending Proceeding in a State Court**

There is both an alternate forum to protect the interest of the parties, a state court receivership, and that receivership proceeding is substantially underway. The Receiver has already made significant progress in stabilizing the Debtors and transitioning Spectrum for a sale.

**3. Whether Federal Proceedings are Necessary to Reach a Just and Equitable Solution**

**4. Whether There is an Alternative Means of Achieving the Equitable Distribution of Assets**

Federal proceedings are not necessary to reach a just and equitable solution. There are no complex federal issues at stake, and the existing receivership proceeding presents a well-established alternative means of achieving the equitable distribution of assets. The Receiver is a fiduciary, appointed and supervised by the court, with the responsibility to review and pay claims, and administer and sell the Debtors' assets with court approval after proper notice. In fact, Tayeh has filed the petition solely in hopes that he can be restored to his former position.

### 5. Whether the Debtor and the Creditors are able to Work Out a Less Expensive Out-Of-Court Arrangement which Better Serves all Interests in the Case

Given the existence and progress of the receivership proceeding, an abstention that allows the Receiver to continue his work, and avoids the duplication of effort and expense that would result from pursuit of this case in bankruptcy presents a less costly arrangement that will benefit all interests in the case. Moreover, the Bank has agreed to a Cash Collateral Order with the Receiver that allows for smooth continued operation of the Debtors' business. The Bank will not consent to use of its cash collateral in a debtor-in-possession scenario.

### 6. Whether a Non-Federal Insolvency has Proceeded so far that it would be Costly and Time Consuming to Start Afresh with the Federal Bankruptcy Process

As detailed above, the receivership proceeding is a non-federal insolvency that has proceeded so far that it would be costly and time consuming to start afresh with the federal bankruptcy process. If this case were to remain in bankruptcy, the Bank would immediately seek the appiontment of Chapter 11 trustees based on the Debtors' principal's actions. A Chapter 11 trustee would have to repeat many of the same actions that the Receiver has already taken, and retread the same ground that the Receiver has already covered. The Receiver has already invested a substantial amount of time, energy, and resources into stabilizing the Debtors, placating the critical constituencies to allow for transition to a buyer, and marketing Spectrum to a buyer who can run the business in a sustainable manner. Restarting the process in bankruptcy would not benefit any constituency. Terminating the receivership places the Debtors' business and its going concern value in jeopardy, and imposes a great risk on any recovery by the Bank and other creditors.

### 7. The Purpose for Which Bankruptcy Jurisdiction has been Sought

The Debtors' principal filed these Petitions solely to try to reinsinuate himself into the company, and thwart the orderly receivership process. His absence from the companies during the receivership has been welcomed by the employees, and has allowed Spectrum to begin to repair damaged relationships with critical vendors. Allowing these matters to proceed in Chapter 11 as debtors-in-possession with Tayeh again at the helm would return the Debtors to the instability they suffered prior to the receivership. The Bank, the Debtors' creditors, and Spectrum's employees justifiably have no confidence in the ability of Tayeh to operate the business. The Bank will not fund a DIP, and appointing a trustee unnecessarily adds substantial administrative expense that is easily avoided by abstention. Thus, the Debtors' principal's purpose in filing the Petitions supports abstention.

**Substantial case law supports abstention.**

In *In re Fax Station, Inc.*, Judge Votolato granted abstention as to two bankruptcy petitions, one involuntary and one voluntary, that were filed on the heels of a state court receivership proceeding. The court concluded that the petitioner was using the bankruptcy process to avoid a well-established pending state court receivership process to resolve management and stockholder problems. The court found that to be an improper use of the bankruptcy process. 118 B.R. at 177-78. Such is the case here where the Debtors' principal seeks to use the bankruptcy process solely to reinstate himself into the Debtors' affairs.

In *In re Birchall*, 381 B.R. 13, 19 (Bankr. D. Mass. 2008), the Massachusetts bankruptcy court, Hillman, J., considered the petitioner's "suspicious" activities, including destruction of records, as a basis to abstain in addition to his consideration of the seven *Fax Station* factors.

11

There are certainly plenty of suspicious activities in this case that warrant refusing to restore Tayeh to his leadership role.

In *In re Michael S. Starbuck, Inc.*, 14 B.R. 134, 135 (Bankr. S.D.N.Y. 1981), the bankruptcy court abstained from hearing the petition and dismissed the case, concluding that:

> Many services, already rendered in the administration of the receivership estate, would have to be repeated at additional expense to the estate. No advantage would accrue to the creditors if this matter were to proceed in the bankruptcy court. Rather, their best interests will be served by the continued administration of the equity receivership.

*See also In re Starlite Houseboats, Inc.*, 426 B.R. 375, 389 (Bankr. D. Kans. 2010) ("Given the status of the receivership and the status of Debtor's affairs, the administration of the Debtor's estate is best left to the state court."). The same consideration applies here. The Debtors are operating smoothly under the Receiver, and substantial expenses would be incurred to repeat services already performed by the Receiver.

The bankruptcy court in *In re L&M Video Productions, Inc.*, 2007 Bankr. LEXIS 2172, *23 (Bankr. N.D. Ohio 2007) abstained from jurisdiction where the court concluded the debtor had filed the petition to avoid a materially advanced state court receivership proceeding and the petitioner had filed the bankruptcy case primarily as a litigation tactic rather than to reorganize the debtor. As in *L&M*, the petitioners in these cases seek to stop the materially advanced receivership primarily to advance the principal's litigation tactic to be reinstalled.

In sum, this case meets all the factual and legal criteria for this Court to exercise its discretion to abstain from jurisdiction and allow the receivership proceedings to run their course. Based on the foregoing, Bank Rhode Island respectfully asks the Court to grant its Motion to Abstain, preclude Tayeh from assuming any role in operation of the Debtors, and award such other and further relief as the Court deems just and proper.

## Notice

In accordance with MLBR 9013-1(g)(1)(C), notice of this Motion, shall be provided to the Debtor, the Debtor's counsel, any trustee, the trustee's counsel, the United States trustee, any directly affected creditor, and any party that has entered an appearance or has requested notices.

PLEASE NOTE THAT BANK RHODE ISLAND IS MOVING THE COURT FOR EMERGENCY HEARING OF THE INSTANT MOTION WHICH MAY AFFECT THE RESPONSE TIME.

                                              BANK RHODE ISLAND
                                              By its Attorneys,

                                              /s/ *Gardner H. Palmer, Jr.*
                                              Joseph M. DiOrio   (BBO # 638546)
                                              Gardner H. Palmer, Jr.   (BBO # 551935)
                                              DiOrio Law Office
                                              144 Westminster Street, Suite 302
                                              Providence, RI  02903
                                              401 632-0911/401 632-0751 Fax
                                              jmdiorio@dioriolaw.com
                                              ghpalmer@dioriolaw.com

Date:  May 1, 2015